FILED
2022 FEB 8 PM 1:55
CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| ANGELA MOLENI, Plaintiff, v. DELTA AIR LINES, INC., Defendant. | **REPORT AND RECOMMENDATION TO GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:21-cv-00043<br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Daphne A. Oberg |
| --- | --- |

Pro se Plaintiff Angela Moleni brought this action against her former employer, Defendant Delta Air Lines, Inc. ("Delta"), alleging she was wrongfully terminated because of her race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.  (Compl. 1, Doc. No. 1.)  Delta now moves for summary judgment.  (Def.'s Mot. for Summ. J., Doc. No. 24.)  Upon review of the briefing,[1] even considering the facts in the light most favorable to Ms. Moleni, it is apparent Ms. Moleni cannot establish a prima facie case of discrimination. Moreover, even if she could do so, she has not identified evidence showing Delta's proffered nondiscriminatory reason for terminating her was pretextual.  Accordingly, the undersigned[2] recommends the district judge grant the motion and enter summary judgment in favor of Delta on Ms. Moleni's claim.

---

[1] Pursuant to Local Civil Rule DUCivR 7-1(g), the court concludes oral argument is not necessary and makes this recommendation based on the parties' written memoranda.

[2] On February 16, 2021, this case was referred to the undersigned magistrate judge under 28 U.S.C. § 636(b)(1)(B).  (Doc. No. 10.)

## SUMMARY JUDGMENT STANDARD

Courts grant summary judgment only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013) (internal quotation marks omitted). "A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Id.* (internal quotation marks omitted). In evaluating a motion for summary judgment, the court views "the facts in the light most favorable to the nonmovant and draw[s] all reasonable inferences in the nonmovant's favor." *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015). But "where the non moving party will bear the burden of proof at trial on a dispositive issue that party must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to that party's case in order to survive summary judgment." *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998) (internal quotation marks omitted).

In making or responding to a summary judgment motion:

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

## RELEVANT FACTS[3]

Delta hired Ms. Moleni on June 28, 2010, as a part-time customer service agent. (Ex. 1 to Mot., Dep. of Angela Moleni ("Moleni Dep.") 49:22–25, 50:1–2, 52:12–16, Doc. No. 25-1.)  She worked in this position throughout her tenure with Delta.  (*Id.* at 50:3–9.) In this position, Ms. Moleni provided customer assistance at Delta's ticket counter and flight gates.  (*Id.* at 50:13–25.)  The gates were located in a restricted and secure area of the airport.  (*Id.* at 59:1–5.)

Ms. Moleni was issued written warnings in December 2010, June 2015, and December 2015 for unsatisfactory attendance.  (Ex. 5 to Mot., Warning Letter (Dec. 2, 2010), Doc. No. 25-5; Ex. 6 to Mot., Written Coaching (June 14, 2015), Doc. No. 25-6; Ex. 7 to Mot., Corrective Action Notice (Dec. 17, 2015), Doc. No. 25-7.)  On June 15, 2017, she was given a "Final Corrective Action Notice" based on concerns about her "reliability and job performance," and citing attendance issues.  (Ex. 9 to Mot., Final Corrective Action Notice, Doc. No. 25-9; Moleni Dep. 107:3–5, Doc. No. 25-1.)  The notice stated it would remain in her file until June 9, 2020, and if her attendance did not improve or if she incurred "any further violations," she may be terminated.  (Ex. 9 to Mot., Final Corrective Action Notice, Doc. No. 25-9.)

In September 2016, Delta implemented a mandatory security screening process for its employees in Salt Lake City.  (Ex. 10 to Mot., Memo Re: Delta Employee Screening (Sept. 22,

---

[3] The court considers the evidence submitted with Delta's motion, (Doc. No. 24), Ms. Moleni's opposition, (Doc. No. 26), Ms. Moleni's Motion for a Court Scheduled Hearing, (Doc. No. 34), and Ms. Moleni's supplemental opposition to the motion for summary judgment, (Doc. No. 41). (*See* Order Granting in Part and Den. in Part Pl.'s Mots. and Den. Def.'s Mot. to Strike 6, Doc. No. 40.)

2016) ("Screening Policy"), Doc. No. 25-10.)  Delta sent the new screening policy to all airport customer service employees, including Ms. Moleni, via email.  (*Id.*; Ex. 11 to Mot., Decl. of Bret Larson ("Larson Decl.") ¶ 6, Doc. No. 25-11; Ex. 12 to Mot., Decl. of Kelley Nabors ("Nabors Decl.") ¶ 9, Doc. No. 25-12; Ex. 13 to Mot., K. Nabors Note to File (Oct. 24, 2017), Doc. No. 25-13; Moleni Dep. 93:20-25, 94:1–16, Doc. No. 25-1.)

The screening policy states, "All team members must present themselves for screening at the beginning of their shift if they are working in a Restricted or Sterile area."  (Screening Policy, Doc. No. 25-10.)  Employee screening was available at two checkpoints in the airport, which were open twenty-four hours per day.  (*Id.*)  Employees could also use the Transportation Security Administration ("TSA") pre-check lanes.  (*Id.*)  The policy states, "No Delta personnel or vendors are exempt from entering the Restricted (below-wing) or Sterile (above-wing) area without presenting themselves for screening at one of these locations or a TSA approved checkpoint."  (*Id.*)  Once employees have gone through screening at the beginning of their shift, they may exit and return through the secure area without going through screening again.  (Nabors Decl. ¶ 12, Doc. No. 25-12; K. Nabors Note to File, Doc. No. 25-13.)

Ms. Moleni worked in a secure, above-wing area which was subject to the screening policy.  (Moleni Dep. 98:20–22; 99:1–11, Doc. No. 25-1.)  Ms. Moleni was aware of the employee screening areas and went through them at times.  (*Id.* at 99:24–25, 100:1–6, 130:15–21.)  However, according to Delta, in September 2017, a bag room employee notified Delta that Ms. Moleni was bypassing the mandatory employee screening.[4]  (*See* Mot. ¶ 42, Doc. No. 24;

---

[4] To support this fact, Delta cites only Ms. Moleni's testimony acknowledging this is what Delta told her happened, and that she had no reason to dispute it.  (*See* Mot. ¶ 42, Doc. No. 24 (citing

Moleni Dep. 121:13–25, Doc. No. 25-1; Ex. 18 to Mot., Memo from J. Haire to K. Stowe (Oct.

12, 2017) ("Haire Memo"), Doc. No. 25-18.)  Delta investigated the allegations by reviewing

surveillance footage and a log of Ms. Moleni's employee badge access.  (Moleni Dep. 123:1–5,

Doc. No. 25-1; Haire Memo, Doc. No. 25-18.)  Delta discovered Ms. Moleni had bypassed

security by entering the bag room at the start of her shift without first going through screening.

(Moleni Dep. 123:6–13, Doc. No. 25-1; Haire Memo, Doc. No. 25-18.)

     Delta's bag room is a secure area located on the main floor of the airport behind the ticket

counter.  (Moleni Dep. 69:3–19, 70:7–8, Doc. No. 25-1.)  It was possible for Ms. Moleni to

access the ticket counter by swiping her security card, entering the bag room, and then passing

directly through the bag room to the ticket counter, without going through the employee

screening.  (*Id.* at 69:13–19, 71:8-21, 72:3–6.)  Likewise, when she worked at the gates, it was

possible for Ms. Moleni to pass through the bag room, walk out to the tarmac, and then climb up

the stairs to the concourse to work her shift, without going through screening.  (*Id.* at 71:22–25,

72:1–18.)  Ms. Moleni testified that on more than a dozen occasions, she went to work through

the bag room without first submitting to the employee screening.  (*Id.* at 123:9–13, 129:20–23,

---

Moleni Dep. 121:13–25, Doc. No. 25-1).)  Elsewhere in its motion, Delta cites a memorandum
from Ms. Moleni's supervisor, John Haire, stating: "On September 24, 2017 it was brought to
our attention that Angela Moleni entered a secure area of the airport through terminal 2 doors
120 and 120A bypassing required employee screening."  (Ex. 18 to Mot., Memo from J. Haire to
K. Stowe (Oct. 12, 2017), Doc. No. 25-18.)

In her opposition, Ms. Moleni does not appear to dispute that a bag room employee reported a
security violation.  (*See* Opp'n, Doc. No. 26 at 3, 13.)  Rather, she claims the bag room employee
did not specifically identify her, and that Delta "fabricated" Mr. Haire's memorandum by adding
her name to the bag room employee's report.  (*Id.*)  However, she offers no evidence supporting
her claim that the information in the memorandum was fabricated or inaccurate.

130:1–4.)  Bypassing employee security screening in this manner was a violation of Delta's

policy.  (Screening Policy, Doc. No. 25-10.)

On October 7, 2017, Ms. Moleni's supervisor, Mr. Haire, informed Ms. Moleni she was

being suspended while Delta further investigated her violation of the screening policy.  (Moleni

Dep. 86:21–23, 87:21–23, 88:15–17, 115:15–22, Doc. No. 25-1.)  As part of the investigation,

Mr. Haire emailed Ms. Moleni to ask her about bypassing security screening.  (*Id.* at 86:19–23;

Ex. 15 to Mot., Email chain between J. Haire and A. Moleni (Oct. 7, 2017), Doc. No. 25-15.)  He

asked her, for example, if she was aware of the screening policy implemented in September

2016.  (Ex. 15 to Mot., Email chain between J. Haire and A. Moleni (Oct. 7, 2017), Doc. No. 25-

15.)  Ms. Moleni responded, "I was aware it was implemented but I am not aware of anything

that I am doing wrong."  (*Id.*)  Ms. Moleni explained, "I usually always clock in baggage to be

on time.  [S]o easiest route for me is through those double side doors just north of baggage."

(*Id.*)  Her explanation was consistent with the surveillance footage and employee badge swipes

Delta reviewed, which showed her accessing the bag room at 5:59 a.m., moments before her 6:00

a.m. shift began, without first going through the employee screening.  (Moleni Dep. 137:4–25,

138:1–2, 145:21–25, Doc. No. 25-1; Ex. 16 to Mot., Surveillance images (Sept. 24 and 25,

2017), Doc. No. 25-16; Ex. 17 to Mot., Moleni access log, Doc. No. 25-17.)

On October 12, 2017, Mr. Haire recommended terminating Ms. Moleni.  (Haire Memo,

Doc. No. 25-18; Moleni Dep. 149:17–21, Doc. No. 25-1.)  Mr. Haire noted, "[W]e validated

from both video and surveillance and SLC SIDA badge swipe times that Angela Moleni worked

9 days in September and on 5 of those days she entered the secure side of the airport without

going through required employee screening."  (Haire Memo, Doc. No. 25-18; Moleni Dep.

157:19–23 (acknowledging that after its investigation Delta determined that she bypassed screening), Doc. No. 25-1.)  After a review of Ms. Moleni's disciplinary history, the memorandum concluded:

> [Ms. Moleni] failed to meet Delta's standards and expectations by bypassing required employee screening.  The safety and security of our customers and employees are always Delta's top priority.  [Ms. Moleni's] unacceptable job performance and reliability negatively impacts our team and our customers.  As a result, I am recommending her employment be terminated.

(Haire Memo, Doc. No. 25-18.)

Two days later, on October 14, 2017, Delta's human resources department ("HR") agreed Delta should terminate Ms. Moleni's employment.  (Nabors Decl. ¶ 13, Doc. No. 25-12; Ex. 19 to Mot., Memo from K. Nabors to J. Jessup (Oct. 14, 2017) ("Nabors Memo"), Doc. No. 25-19; Moleni Dep. 159:18–20, Doc. No. 25-1.)  The HR memorandum recommending termination stated, "Angela Moleni entered a secure area of the airport on multiple occasions without submitting to the required employee screening."  (Nabors Memo, Doc. No. 25-19.)  It concluded: "Angela Moleni should be asked to resign.  If she refuses, she should be terminated."  (*Id.*)  The HR general manager approved that recommendation, and Ms. Moleni was told she would be terminated unless she elected to resign and submitted a letter of resignation by October 28, 2017. (*Id.*; Ex. 20 to Mot., Email from J. Jessup to K. Stowe, J. Haire (Oct. 26, 2017), Doc. No. 25-20; Moleni Dep. 162:10–13, 163:4–11, Doc. No. 25-1.)

Ms. Moleni refused to resign.  (Ex. 21 to Mot., Email from A. Moleni to K. Nabors (Oct. 27, 2017), Doc. No. 25-21; Moleni Dep. 160:19–23, Doc. No. 25-1.)  On October 30, 2017, Delta notified Ms. Moleni her employment was terminated based on her violation of Delta's screening policy.  (Moleni Dep. 171:6–11, 172:9–16, 240:18–21, Doc. No. 25-1; Ex. 22 to Mot.,

Email from K. Nabors to A. Moleni (Oct. 30, 2017), Doc. No. 25-22.)  According to a Delta

senior HR manager, even if Ms. Moleni had had no prior discipline, her violation of the security

policy—standing alone—warranted immediate termination.  (Nabors Decl. ¶ 23, Doc. No. 25-

12.)

On October 18, 2017, after Ms. Moleni's supervisor and HR recommended

termination, Ms. Moleni called Delta's HR helpline to complain about her suspension.

(Moleni Dep. 162:5-9, 227:11-24, 228:14-16, Doc. No. 25-1; Ex. 23 to Mot., Helpline Report

(Oct. 18, 2017), Doc. No. 25-23.)  She alleged other employees also used the secure doors to

access the bag room but were not suspended.  (Moleni Dep. 202:2–4, 204:4–25, 205:1–4,

Doc. No. 25-1; Helpline Report, Doc. No. 25-23.)  Then, in an email to HR on October 27,

Ms. Moleni named four female employees who she claimed breached the security policy but

were not disciplined, and she claimed she was being discriminated against because of her

race.  (Moleni Dep. 197:3-25; 203:12-15, 219:5-7, Doc. No. 25-1; Ex. 21 to Mot., Email from

A. Moleni to K. Nabors (Oct. 27, 2017), Doc. No. 25-21.)  At her deposition, Ms. Moleni

testified these other employees were white, and she observed them entering through the secure

bag room doors.  (Moleni Dep. 196:23–25, 197:1–9, 203:11–17, 204:4–25, 205:1–4, Doc. No.

25-1.)  However, she admitted she did not know whether they had already submitted to

security screening before using these doors.  (*Id.* at 208:19–25, 209:1–3, 209:13–15, 230:6–9.)

She also testified she did not know whether these employees' conduct had been investigated.

(*Id.* at 205:8–10, 206:4–8.)  Delta investigated Ms. Moleni's allegations that other employees

were violating the screening policy by reviewing video surveillance footage and employee

badge swipe records.  (Nabors Decl. ¶ 19, Doc. No. 25-12.)  Delta did not find any security

screening violations by any of the employees Ms. Moleni named.  (*Id.*)

A few months after Ms. Moleni's termination, a white, male employee was reported

by another employee for violating Delta's security policy.  (*Id.* ¶ 20.)  Delta investigated and

determined this employee bypassed security by using his access card to enter the same secure

doors Ms. Moleni had used, without first submitting to security screening.  (*Id.* ¶¶ 20–21.)

According to Delta, although he had no prior discipline in his file, Delta terminated this other

employee for violating the security policy.  (*Id.* ¶ 22; Ex. A to Nabors Decl., Recommendation

for Termination (Jan. 29, 2018), Doc. No. 25-12.)  Ms. Moleni claims Delta did not actually

terminate this employee.  (Opp'n 3, 6, 11, 13, 15, 20, Doc. No. 26; *see also* Pl.'s [Suppl.]

Opp'n to Def.'s Mot. for Summ. J. ("Suppl. Opp'n") 3–4, Doc. No. 41.)  This claim is

addressed in further detail below.

## ANALYSIS

Ms. Moleni claims Delta unlawfully terminated her because of her race, in violation of

Title VII.  (Compl. ¶¶ 22–35, Doc. No. 1.)  In her complaint, she alleges she was the only Pacific

Islander of Tongan heritage working for her supervisor, Mr. Haire.  (*Id.* ¶ 15.)  She alleges Mr.

Haire singled her out for investigation because of her race, even though the bag room employee

who reported the security violation did not identify her as the person who bypassed screening.

(*Id.*)  She alleges similarly situated white employees also bypassed the screening but were not

investigated or disciplined.  (*Id.* at 2–3.)

Under Title VII, it is unlawful for an employer to discriminate against an employee

because of her race.  42 U.S.C. § 2000e-2(a)(1).  "To prevail on a Title VII discrimination claim,

the plaintiff bears the ultimate burden of proving intentional discrimination by the employer." *Singh v. Cordle*, 936 F.3d 1022, 1037 (10th Cir. 2019).  If a party does not present direct evidence of discrimination and relies, instead, on circumstantial evidence, the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies. *Singh*, 936 F.3d at 1037.  First, the plaintiff must establish a prima facie case of discrimination by demonstrating "(1) he was a member of a protected class; (2) he was qualified and satisfactorily performing his job; and (3) he was terminated under circumstances giving rise to an inference of discrimination."  *Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004). "If the plaintiff makes this showing, the burden shifts to the employer to assert a legitimate nondiscriminatory reason for its actions."  *Singh*, 936 F.3d at 1037 (internal quotation marks omitted).  "If the employer does so, the burden shifts back to the plaintiff to introduce evidence that the stated nondiscriminatory reason is merely a pretext."  *Id.* (internal quotation marks omitted).

In its motion for summary judgment, Delta argues Ms. Moleni cannot establish a prima facie case of discrimination or pretext.  (Mot. 26–32, Doc. No. 24.)  The court addresses each issue in turn.

A.  Prima Facia Case

Delta argues that although Ms. Moleni is a member of a protected class, she cannot satisfy the remaining elements of a prima facie case.  (Mot. 26–28, Doc. No. 24.)  Delta contends Ms. Moleni cannot show she was satisfactorily performing her job because, at the time of her termination, she was on final warning status and was violating the screening policy.  (*Id.* at 26.) Delta also argues Ms. Moleni has no evidence she was terminated under circumstances giving

rise to an inference of discrimination.  (*Id.*)  In her opposition, Ms. Moleni argues Mr. Haire singled her out for investigation because of her race, and she contends Delta did not terminate a similarly situated white, male employee who violated the security policy.  (Opp'n 3, 13, 20, Doc. No. 26.)

Ms. Moleni has not identified evidence showing she was terminated under circumstances giving rise to an inference of discrimination.  It is undisputed that Ms. Moleni repeatedly violated Delta's security screening policy, was investigated for this violation, and was terminated as a result.  Ms. Moleni's allegation that Mr. Haire singled her out for this investigation because of her race is unsupported.  Mr. Haire's memorandum indicates he investigated her after "it was brought to [his] attention" that she entered a secure area of the airport after bypassing required employee screening.  (Haire Memo, Doc. No. 25-18.)  Ms. Moleni has presented no evidence supporting her claim that this memorandum is fabricated or inaccurate.  Nor has she presented evidence that Mr. Haire treated her differently than other employees.  For example, she has presented no evidence that other employees bypassed security screening but were not investigated.  Although she testified she saw other employees passing through the same secure doors, she admitted she did not know whether they had bypassed security screening or whether they had been investigated.  (Moleni Dep. 205:8–10, 206:4–8, 208:19–25, 209:1–3, 209:13–15, 230:6–9, Doc. No. 25-1.)

Ms. Moleni's allegation that Delta did not terminate a similarly situated white, male employee who violated the security policy is also unsupported.  Delta presented evidence, including sworn testimony, that it terminated this employee after he bypassed security screening in the same manner as Ms. Moleni.  (Nabors Decl. ¶¶ 20–22, Doc. No. 12; Ex. A to Nabors

Decl., Recommendation for Termination (Jan. 29, 2018), Doc. No. 25-12.)  Ms. Moleni submitted documents from the employee's personnel file, which she argued showed "Delta did not follow Delta's standard termination procedures and did not terminate [him]."  (Mot. for a Ct. Scheduled Hr'g ("Mot. for Hr'g"), Doc. No. 34 at 3.)  However, the documents she submitted do not support her contention.  She filed (1) a recommendation from the operations manager that the employee be terminated for bypassing security screening, (Ex. 7 to Mot. for Hr'g, Doc. No. 34-7); (2) a recommendation from HR that the employee be terminated for this reason, (Ex. 6 to Mot. for Hr'g, Doc. No. 34-6); and (3) an email from HR to the operations manager indicating Delta decided to terminate the employee, and instructing the manager to offer the employee the option to resign in lieu of termination, (Ex. 1 to Mot. for Hr'g, Doc. No. 34-1).  These documents do not demonstrate any departure from the procedures Delta followed in terminating Ms. Moleni, nor do they show that the employee was not terminated.[5]  Ms. Moleni argues the declaration from Delta's HR manager is "fabricated" because it does not identify the employee's termination date.  (Mot. for Hr'g, Doc. No. 34 at 3.)  However, the absence of a termination date is insufficient to support a finding that the employee was not terminated, where Delta provided sworn testimony regarding his termination.  Accordingly, Ms. Moleni fails to raise a genuine dispute of fact on this issue.

---

[5] In her supplemental opposition, Ms. Moleni claims "according to the termination policy [this employee] can only be terminated if he refuses to resign[,] but he never did."  (Suppl. Opp'n, Doc. No. 41 at 4.)  However, the document she cites is an email from HR stating the employee should be informed that he would be terminated if Delta did not receive written notice of his resignation within a specified time.  (Ex. 1 to Mot. for Hr'g, Doc. No. 34-1.)  This document does not support Ms. Moleni's contention that the employee could not have been terminated unless he refused to resign.

In sum, Ms. Moleni has failed to identify evidence that she was singled out or treated differently because of her race when Delta terminated her.  She has simply not demonstrated she was terminated under circumstances which would give rise to an inference of discrimination. Accordingly, Ms. Moleni cannot establish a prima facie case of discrimination.[6]

B.  Pretext

Even if Ms. Moleni could establish a prima facie case, she cannot show Delta's proffered nondiscriminatory reason for terminating her—her violation of the security policy—was pretext for discrimination.

To determine pretext, the court considers whether the employer's "'stated reasons were held in good faith at the time of the discharge, even if they later prove to be untrue,' or whether its 'explanation was so weak, implausible, inconsistent, or incoherent that a reasonable fact finder could conclude that it was not an honestly held belief but rather was subterfuge for discrimination.'" *Mann v. XPO Logistics Freight, Inc.*, 819 F. App'x 585, 595 (10th Cir. 2020) (unpublished) (quoting *Simmons v. Sykes Enters.*, 647 F.3d 943, 947–48 (10th Cir. 2011)). "Typically, a plaintiff will take one of three routes to establish pretext: '(1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy . . . ; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice.'" *Id.* (alteration in original) (quoting *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1230 (10th Cir. 2000)). "A plaintiff who wishes to show that the company acted contrary to an unwritten policy or to

---

[6] Because Ms. Moleni fails to meet this element, the court need not determine whether Ms. Moleni also fails to meet the second element necessary to establish a prima facie case.

company practice often does so by providing evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness." *Kendrick*, 220 F.3d at 1230.

Ms. Moleni has failed to show Delta's proffered reason for terminating her was pretext for discrimination, for the same reasons she failed to establish a prima facie case of discrimination. Ms. Moleni does not dispute she violated Delta's security policy, or that such a violation is grounds for termination. Rather, she argues she was singled out and treated differently than similarly situated white employees. However, as set forth above, she has failed to identify evidence supporting these allegations. Her claim that Delta did not terminate a white, male employee who violated the same policy is unsupported, and she has presented no evidence that other employees bypassed security screening procedures without being terminated.

## RECOMMENDATION

Because Ms. Moleni cannot establish a prima facie case of discrimination and failed to identify evidence showing Delta's proffered nondiscriminatory reason for terminating her was pretextual, the undersigned RECOMMENDS the district judge GRANT the motion for summary judgment (Doc. No. 24) and enter judgment in favor of Delta on Ms. Moleni's claim.

The court will send copies of this Report and Recommendation to all parties, who are notified of their right to object to it. Any objection must be filed within fourteen days of service,

pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.

Failure to object may constitute waiver of objections upon subsequent review.

DATED this 8th day of February, 2022.

BY THE COURT:

_Daphne A. Oberg_

Daphne A. Oberg
United States Magistrate Judge

15